## THE STATE OF IOWA v. VANCE.

1. **Evidence: PRESUMPTIONS.** When the record shows that on the trial of a criminal action, one declaration of the defendant was admitted in evidence, and that subsequent declarations or conversations were offered, but it does not appear affirmatively that they related to the same subject, or were necessary to explain, or make the declaration admitted fully understood, the Supreme Court will presume that the evidence was properly rejected by the court below.

2. **Homicide: PROVOCATION.** A provocation which does not place the party in a position where self defense is necessary, may reduce a homicide to manslaughter, but can never make it excusable or justifiable.

3. —— **TRESPASS: CHARACTER OF WEAPON.** A bare trespass against the property, not dwelling, of another, is not a sufficient provocation to warrant the owner in using a deadly weapon in its defense; and if he uses such a weapon and kills the trespasser, it will be murder, and this though the killing were actually necessary to prevent the trespass. If the killing occur without any intention to take life, or in passion, it may be manslaughter, but cannot be less. But if the injury be inflicted with a weapon and in a manner not likely to produce death, and the trespasser should happen to be killed, it will be no more than manslaughter.

4. —— **RECKLESSNESS.** If one fires a gun recklessly or heedlessly, and death is caused thereby, the offense will be at least manslaughter, notwithstanding the gun was pointed in the range of the deceased by accident, with no desire or intention to wound or kill. Where the act is attended with deliberation, and its probable consequences are mortal or dangerous injuries to any person or persons, the grade of the offense is determined by the degree of deliberation.

5. **Instruction.** The propriety of language used in an instruction to a jury considered and discussed.

*Appeal from Des Moines District Court.*

THURSDAY, OCTOBER 13.

THE defendant was indicted and tried for the crime of murder, in killing one Henry Haynes. He was found guilty of manslaughter, sentenced to the penitentiary for seven years, and to pay a fine of $500. To reverse this judgment, he prosecutes this appeal, and assigns ten errors, which, so far as material, will be found referred to in the opinion of the court.

*J. C. & B. J. Hall* and *M. D. Browning* for the appellant.

*C. C. Nourse,* Attorney-General, for the State.

WRIGHT, Ch. J. — That deceased was killed on the night of the 7th of August, 1863, there is no controversy. It is equally clear from the testimony that he was at the time on the premises of the prisoner, in the act of stealing melons, or in eating those which, with others, he had pulled and removed from the vines. The testimony also satisfactorily establishes that the mortal wound was inflicted on the head and neck, by a discharge from a gun then held and fired by the prisoner, and that the deceased lived for about one hour after being thus wounded. Thus much for the admitted or well established facts, before proceeding to the consideration of the questions made by counsel in their argument. And we may premise that we shall examine the questions thus made, without undertaking to discuss in detail the several errors assigned.

I. It seems that the prisoner was at his house, and learned that some persons were in his melon patch; that he immediately started, and some half hour afterwards the gun was fired. He took his gun with him, and said to a witness as he started, that it was loaded with "fine cut lead." Immediately after firing,

1. EVI-
DENCE;
presump-
tions.

he ran towards the house and exclaimed to a witness, "My God, come here! I believe somebody is mortally hurt," or, "I believe I have shot somebody." After this, but how soon does not appear, the witness, with the prisoner and several others, went to the body, and the prisoner's counsel sought to elicit what he *then* said. This was objected to, and the objection sustained. It also appears that the prisoner, soon after the body was found and taken to the house, started for a physician, and that before he returned Haynes died; and that this same witness met the physician and defendant, and informed them of the death. The physician was afterwards asked to state what was said between the person they met, who informed them of the death of Haynes, himself and the defendant. The question was objected to, the objection sustained, and these several rulings are now assigned for error. To sustain his position, appellant relies upon the Rev., § 3992, which declares, that when part of a declaration or conversation is given in evidence by one party, the whole, *on the same subject*, may be inquired into by the other. And when a detached declaration or conversation is given in evidence, any other declaration or conversation, which is necessary to make it fully understood, or explain the same, may also be given in evidence. In presenting a question of this character, it is to be regretted that counsel did not, by the bill of exceptions, more clearly develop the subject matter and general nature of the conversation sought to be elicited. Than the one before us, no record could certainly leave a question in a more general or indefinite form. Thus, as the parties advanced to the body, counsel sought to know what the prisoner *then* said. But upon what subject? Did this conversation relate to anything that he had before spoken of, or any conversation previously detailed by the witness? Was this last declaration necessary to explain, or make fully understood, any preceding declaration or

conversation? There is certainly nothing to satisfy us of the affirmative of these propositions. Suppose the prisoner, at that time, had referred at length to the manner in which he had been harassed and injured by the deceased and others, on previous occasions, in the destruction of his melons and vines. Suppose he had undertaken to detail the conduct of the deceased, and how he was compelled to shoot him in self-defense; or, suppose he then stated that one of the parties, with the deceased, had, in the dark, accidentally, taken his life, in firing at the prisoner; would it be pretended that this, or any similar testimony, would have been admissible? The prisoner had previously said that the gun was loaded "with fine cut lead," and had exclaimed, immediately after the homicide, "I believe somebody is mortally hurt," or, "I believe I have shot somebody," but how could a conversation upon the subject of his prior injuries, and matters of that character, be justly or correctly construed to refer to the same subject, or deemed necessary to explain or fully understand the preceding transaction or conversation? And this reasoning and these inquiries have additional force, in the thought that all of the testimony shows incontrovertibly that the gun was thus loaded, and was fired by the prisoner. Upon these subjects there could be no explanation. As to the main, or cardinal facts, there was, and could be, no controversy. Anything that the prisoner may have said, could not possibly have given a different version to the actual and admitted facts of the transaction. We conclude, therefore, that while the prisoner might possibly have said some things, which, under the rule referred to, should have been admitted, the record does not exhibit sufficient to satisfy us that the court erred in excluding that which was offered. A party should bring himself within the rule, and not leave us to conclude, by inference and conjecture, that he has been prejudiced. And this conclusion we reach

without reference to the *time* at which the second conversation took place.

We need hardly say that the reasoning which would exclude the conversation, before the prisoner left for the physician, would apply with even more weight to what occurred when the witness met them coming to the house. This testimony was not offered to contradict what the witness had said. Indeed it is not pretended that it had any reference whatever to the death of Haynes. For aught that appears, it related to another and entirely independent transaction. In excluding it, we certainly cannot say the court erred.

II. It is claimed that the instructions as given and refused, gave wrong definitions of the crime of manslaughter, and were severally, and as a whole, not applicable to the facts given in evidence. The instructions upon this subject were as follows: *First*, If the jury find that the defendant, believing a person to be in his melon patch stealing melons, and that he, not intending to kill, but carelessly and recklessly fired his gun, loaded with a deadly charge, in the direction he supposed the person to be, and killed the deceased, then he is guilty of manslaughter. *Second*, It is unlawful for any one to shoot at or kill a trespasser, or one stealing from his farm, before making other and milder efforts to prevent it, be this trespass or stealing in the night or daytime. *Third*, If, from the evidence, you find that defendant went out in a sudden passion, with a gun loaded with a deadly charge, intending to shoot any person stealing melons from his patch, and never intending to kill, but only to injure the deceased; but he did inflict wounds which produced death — even such finding will not make the crime less than manslaughter; and if you find that there was time for the passion to subside before the shooting, or that there was an intention to kill, or do great bodily harm, it would be murder in the second degree.

Other instructions were given, defining murder in the second degree, under what circumstances malice would be presumed; how, and from what facts, the intention of the defendant to take life might be inferred — to some of which, however, we do not understand that objections are now urged. The court refused the following instructions: *First*, The offense of manslaughter may be committed without any actual malice or intent to kill; but it must be the result of an intentional, unlawful purpose or act against deceased or some other person. *Second*, The fact that a gun is pointed or even discharged *point blank* at a person, does not render the act unlawful, unless the pointing or shooting is done in an unlawful act, or with an unlawful intention, as if done accidentally or unintentionally. Thus, if the jury find that the gun was pointed and discharged in the range of the deceased, so as to inflict the wounds and produce the death; yet if the jury *also* find that the discharge of the gun was made with the sole purpose of frightening away men who were in the night time depredating upon defendant's premises and property; and also find that the range in which the gun was pointed and discharged, happened to be towards the deceased, by reason of accident and the darkness of the night, and not by reason of an intent or expectation to hit or kill deceased or other person, or to do any unlawful act, then such pointing and discharge of the gun was not an unlawful act, and the jury should acquit the defendant.

The following instruction asked by defendant was given as modified (modification included in brackets): "If you believe that the deceased, with others, was engaged in stealing defendant's melons in the night time; and the defendant, without any intention or purpose of injuring the deceased, or any other person, but for the sole purpose of frightening the depredators, and by mere accident, and without intent to injure any one, fired off his gun and pro-

duced the death of deceased [and the gun was not intended to be aimed at, or fired in the direction of the deceased or other person], then the jury should acquit; and in considering the case, it is your duty to take into consideration all the circumstances — such as loading the gun, the manner of using it, the conduct of the defendant, and all the surrounding facts.

We have thus fully stated the material instructions given and refused, that the positions of the respective parties and the views of the case entertained by the court, may be the more readily seen. The statement of a few general propositions will be sufficient to show how little cause appellant has to complain.

2. HOMI-CIDE: provocation. A provocation may reduce a homicide to manslaughter, but never can render it excusable or justifiable. Thus, if A. kills B. suddenly, with or without any *considerable* provocation, the law implies malice, and he is guilty of murder. If, however, the provocation were great, such as must have *greatly* provoked A., the killing is manslaughter. (Of course no one will apply this general language to a case of self defense.) Equally well settled is 3. — TRES-PASS: character of weapon. the proposition, that a bare trespass against the property of another, not his dwelling, is not a sufficient provocation to warrant the owner in using a deadly weapon in its defense, and if he uses such a weapon, and kills the trespasser, it will be murder, and this though the killing were actually necessary to prevent the trespass. If it appears that the intention was not to take life, but merely to chastise the trespasser, and to deter the offender from repeating the same, the offense may be extenuated, and will be no more than manslaughter. If the killing take place in the passion or heat of blood, it may be manslaughter, but cannot be less. Or, as the same principle is elsewhere expressed, trespass against property (not a dwelling house) is not such a provocation as will

warrant the owner in using a deadly weapon. If he does so and death ensues, it is murder, because an act of violence beyond the provocation. But if the injury be inflicted with an instrument, and in a manner not likely to kill, and the trespasser should, notwithstanding, happen to be killed, it will be no more than manslaughter, the law so far recognizing the adequacy of the provocation arising from the trespass. Am. Cr. Law, §§ 970, 975, 1025; *Claxton* v. *The State*, 2 Humph., 181; *McCoy* v. *State*, 3 Eng., 451; Whart. on Hom., 168, 185, 466; *Commonwealth* v. *Drew*, 4 Mass., 391; 2 Bish. Cr. L., §§ 544, 546, 548, 558, 559; 1 Id., § 397.

In the oft-quoted case, *supra* (4 Mass., 391), (which was certainly in view of the law, as given by PARSONS, Ch. J., a much more favorable case for the prisoner upon the present question than the one before us), this rule was announced. "When the trespass is brought against the property of another, not his dwelling house, it is not a provocation to warrant the owner in using a deadly weapon; and if he do, and with it, kill the trespasser, this will be murder, because it is a degree of violence beyond the degree of the provocation; but if the beating be with an instrument, and in a manner not likely to kill, and the trespasser should, notwithstanding, happen to be killed, it will be no more than manslaughter." And see further, *Cokeley* v. *The State*, 4 Iowa, 477; and *State* v. *Shelleday*, 8 Id., 477, and the cases there cited. In this case the prisoner used a deadly weapon, the deceased was not in the commission of a known felony, such as murder, rape, burglary and the like (1 East P. C., 271), the prisoner made no use of other or milder means to prevent the trespass or drive away the depredators, the gun was fired intentionally and not by accident (whether at the deceased, is a question we shall subsequently consider), and thus far, upon well settled

The State of Iowa v. Vance.

principles, the offense was at least manslaughter, if not murder in the second degree.

II. But it may be suggested, as indicated in some of the instructions asked and refused, that the killing was accidental, that the prisoner fired his gun for the purpose of frightening those trespassing upon, and destroying his property, and with no intention of taking life. Whether this correctly embodies appellant's position, we cannot say, as counsel have, instead of an argument, favored us with a very condensed brief, which is in fact but little more than an assignment of errors. Assuming, however, that this is his position, we shall briefly discuss it.

*4. — Reck-lessness.*

It is not pretended that the prisoner did not *intend* to fire the gun; he knew that it was loaded with powder and lead. The shot took effect upon the head and neck of the deceased, inflicting, according to the testimony, from six to twenty-three wounds. He was advised that persons were in the melon patch; he left the house with the gun, intending, at least, to drive or frighten them away. After reaching the ground, it was several minutes before the gun was fired; he had ample time for reflection and deliberation; he did not act from the sudden impulse of passion. Under such circumstances, it seems to us that the instruction asked by the defendant, and given, with the modification, was as favorable as he had any reason to ask. Under this, the jury could well infer that they were to acquit, if "the gun was not intended to be aimed at, or in the direction of the deceased or other persons." The other instruction, however, goes even further; and, in effect, makes the pointing or discharging of a gun "point blank" at another, excusable or not criminal, "unless done in an unlawful act, or with an unlawful intention." Such a proposition loses sight of, and ignores the following and analogous rules: If one fires a gun recklessly or heedlessly, he will not be excused; and his offense will be at least manslaughter,

though the weapon was pointed in the range of the deceased by accident, with no design or intention to wound or kill. If the act is attended with probable mortally dangerous consequences to the deceased, or persons generally, and death should ensue, the crime is murder or manslaughter, depending upon the degree of deliberation. The law always presumes that a party intended the probable and natural effects of his deliberate act; and when, therefore, the killing is deliberate, malice is presumed, and the crime is murder, unless sufficient excuse or provocation is shown. A homicide (amounting to murder or manslaughter, according to circumstances) may be committed, in opposing even an *unlawful* effort to carry away property. The owner may resist the taking, but not to the taking of life. And, as a party could not, in any emergency, lawfully employ a deadly weapon for such purpose, neither could he, it would seem, use it in the form of a threat, as to frighten or drive away those committing the waste. It is certainly true that if death should ensue from the carelessness of the party, in thus attempting to frighten the depredator, he would not be excused, though he had no intention of wounding or killing any one.

We remark, in conclusion, in this part of the case, that a person, in the commission of a crime, may determine to do the wrong, or act with such indifference as almost, if not quite, "supply the place of the more positive mental condition." Applying this proposition, thus briefly stated, to cases of homicide, and the rule is, that every act of gross carelessness, even in the performance of what is lawful, and, *a fortiori*, of what is not lawful, and every negligent omission of a legal duty, whereby death ensues, is indictable, either as murder or manslaughter. *Rex* v. *Carr*, 8 C. & Payne, 163; 2 Archb., 9; *U. S.* v. *Freeman*, 4 Mason, 505.) In the light of these principles, we need do more than say, that the first instruction asked by defendant was pro-

perly refused. For, according to that, to constitute the offense (of manslaughter), the killing must have been the result of an *intentional, unlawful* purpose or act, against the deceased or some other person.

III. The court, in the charge in chief, uses this language: "Boys have no right to enter a melon patch of another, and help themselves to his melons without his consent; but it would be a reproach to the laws of any state or country, to hold that for such an act, the owner has a right, without notice or warning, to shoot them down and take their lives." It is claimed that this remark was out of the case, and strongly tended to give the minds of the jury a wrong impression and unjust prejudice. And, in the same connection, it is urged that, under the evidence, and the law applicable, the prisoner was improperly convicted. In neither of these positions can we concur. The charge shows a proper appreciation of the sacredness of human life, and reflects the mind of a tribunal justly impressed with the necessity of fairly and fearlessly administering the law. There is no scintilla of evidence that the deceased and his comrade knew, or had any intimation that the prisoner was near them, or that he contemplated their injury. It is true, they were engaged in an unlawful act. The law has, however, given to persons thus trespassed upon, other and ample remedies for all injuries inflicted. Not only so, but the law demands, in consonance with the plainest dictates of reason and humanity—in view of the magnitude of the crime, and the sacredness of human life—that the party injured shall resort to other means, shall adopt other methods of checking the trespass; and will not allow him thus to take life. And it truly would be a reproach to the law, if a person, because of such a trespass, could be protected in the commission of so great a wrong. If so, the court did not transcend its duty in so saying to the jury. The law ought to be vindicated. No innocent man ought

to suffer. If possible, no guilty one ought to escape. Every defendant ought to have a fair and impartial trial, and the full benefit of every reasonable doubt. This, a court should studiously exert itself to give him. But we know of no reason why a court should not call things by their right names, and, if need be, use strong, if correct language, in criminal and civil cases, alike, if, by so doing, a guilty man is the more surely brought to justice. It is certainly not the fault of the court, but of the party who, it may be, in a thoughtless and unguarded moment, has violated the law, of the enforcement of which he now complains.

But, without extending the argument, we remark, in conclusion, that we see nothing in the record to indicate that the prisoner did not have a fair and impartial trial. What we have already said sufficiently indicates our general views of the case. The jury, in our opinion, could not consistently have dealt more leniently with him than they did.

Affirmed.