THE STATE OF IOWA v. DECKLOTTS.

1. Criminal law: MALICE. Malice is presumed from the commission of an act wrongful in itself and without just cause or excuse.

2. —— MURDER. Malice is essential to the crime of murder — it is not necessary that it should have existed for any considerable length of time, but it is sufficient if it existed for any length of time.

3. Instructions: PROPRIETY. The propriety of instructions given by the court below on the trial of an indictment for murder considered and determined.

4. Criminal law: MURDER: INTENT. Our statutes have not altered the common law requisites of murder. A specific intention to kill is not essential at common law to constitute murder, nor is it essential under our statute to murder *in the second degree*, although it is essential to murder in the first degree.

5. —— MOTION FOR NEW TRIAL: PRISONER'S PRESENCE. While it is better that the defendant should be present when a motion for a new trial, in a

criminal cause, is made and is passed upon by the court, it is not clear that it is necessary.

6. —— OFFER TO RECONSIDER. But when the prisoner objected to sentence on the ground that he was not in court when the motion for new trial was made and determined, and the court offered to again consider and to hear a reargument of the motion, it was held that there was no error to the injury of the prisoner.

7. —— MANSLAUGHTER. When death ensues from sudden transport of passion, or heat of blood, upon *reasonable provocation*, without malice, the offense is manslaughter and not murder.

*Appeal from Linn District Court.*

FRIDAY, JANUARY 12.

MURDER: IMPLIED MALICE: REQUISITES OF MURDER: DEGREES OF: PERSONAL PRESENCE OF DEFENDANT ON TRIAL. — The defendant was indicted and tried for the murder of one Daniel Clark Akers. Plea: Not guilty. Verdict: Guilty of murder in the second degree. Judgment: Sixteen years in the penitentiary of the State.

Defendant appeals. The errors assigned, and the facts, so far as material, will be found in the opinion.

*Isaac L. Allen,* Attorney-General, for the State.

*I. M. Preston & Son* for the defendant.

DILLON, J. — I. It is claimed by the defendant, that the court erred in giving the seventh, eighth, ninth, fifteenth and sixteenth instructions to the jury, defining malice.

1. CRIMI-NAL LAW: malice.

The seventh instruction asserted that malice did not, in such a case as this, "necessarily mean spite or hatred, although these elements may exist; but it means the doing of an act, wrongful in itself, without just cause or excuse."

The eighth instruction ˙ defined *express* malice, to which there is no objection. In reference to *implied* malice, it laid down, among other propositions, the following: "hence, when one person assaults another with a deadly weapon, or an instrument likely to produce death, the law presumes malice, in the absence of proof, either direct or by circumstances, to the contrary."

The ninth instruction declared that there could be no murder without malice, and added, "that it is not necessary 2. — mur- that such malice should have existed for any der. considerable length of time, and it is sufficient that it exists for any length of time before the commission of the act."

The fifteenth and sixteenth instructions simply directed ˙ the jury to consider these principles in determining their verdict, and if this should be one of guilty, the' degree of the offense.

That these directions to the jury were applicable to the testimony is not disputed. That they conform to the law as settled in the courts of England, and of this country, requires no elaboration to show. They not only express the law, but they express it with but little verbal, and without essential variation from the language of the accepted authorities and text books in reference to this subject, and in language which, in substance, has been more than once employed in the published judgments of this court. *The State* v. *Gillick*, 7 Iowa, 287; 1 Hale, 454; Kel., 64; 1 Russell on Crime, 482.

The killing, in the case at bar, was by the intentional use of a loaded revolver, discharged into the breast of the deceased. It was entirely correct for the court to state to the jury, that malice might properly be inferred from the · use of such a weapon, unless the circumstances in evidence · rebutted such an inference.

II. The twenty-third instruction is objected to by the

defendant as not embracing any question of law; as being

3. INSTRUC- an argument against him, and calculated to mis-
TION: pro-
priety.     lead the jury.

That instruction was in this wise: "You should endeavor to move forward in the discharge of this duty without hesitation, fear or favor, let the result and its consequences be what they may. The good of society requires that crime should be surely and promptly punished. No considerations of sympathy or excessive kindness should for a moment deter you from finding the defendant guilty, if you are satisfied from the testimony, beyond a reasonable doubt, that he is so guilty." The next instruction was thus: "On the other hand, you are to be uninfluenced by any excitement or prejudice in the community, which has less reliable knowledge of the facts and less legal and moral responsibility than you have, acting upon oath. The vast importance to the defendant, of the result of your deliberations, should alone prompt you to a careful and full investigation of the whole case, actuated by but one motive, that of doing entire justice under the evidence, and the law as given you by the court."

These instructions are, of course, to be taken together. We perceive no objection to them. They are certainly not obnoxious to the criticism of containing an argument against the defendant, nor are they calculated to mislead the jury. We will suppose, indeed it is our duty to suppose, that they were called for by the special circumstances which surrounded the case. At all events, they simply enjoin upon the jury a full, careful, conscientious consideration of the case, and a manly discharge of their duty; and are, in trials of such magnitude, entirely proper. *The State of Iowa* v. *Vance*, 17 Iowa, 138, and the observations of WRIGHT, Ch. J.

III. The defendant requested the court to charge that,

" To convict of murder in the *second* degree, you must be
satisfied, from the evidence: First. That the
defendant killed the person named in the indict-
ment. Second. That this was done purposely, unlawfully
and maliciously. Third. That the defendant *intended to
kill;* and, Fourth. That the act was done with malice
aforethought." This the court refused to do, and properly
so. Our statute has not altered the common law requisites
of murder. What was murder at common law is still
murder under our statute. The boundaries of the field of
this offense remain unchanged, but it is divided into two
degrees, murder in the first, and murder in the second
degree. A specific intention to kill, to take life, is not
essential at common law to constitute murder, nor is it
essential, under our statute, to constitute *murder in the
second degree*, although it is essential to constitute murder
in the *first* degree.

*4. Criminal law: murder: intent.*

The unsoundness of the proposition prayed to be given
to the jury can be briefly illustrated. Suppose I shoot at
a person or strike at him, with the specific intention to
maim him, or do him great bodily injury, but the unlaw-
ful shot or blow, instead of accomplishing or effecting my
purpose, goes beyond it, or beside it, and takes his life.
Unless there are some justifying or mitigating circum-
stances, I am guilty of murder; but it is murder of the
second degree, and I am thus guilty, though there was no
intention on my part to take life. Fost., 258, 569; 1 Rus.,
540; Whart., 379, and authorities cited; *Commonwealth*
v. *Varney*, 8 Bost. L. R., 542, per SHEPLY, J., cited Whart.,
434; *State of Iowa* v. *Kennedy*, 20 Iowa.

IV. When asked by the court why the judgment should
not be rendered against him, the defendant filed his affida-
vit, stating that he was not personally present in
court at the time when his motion for a new trial
was made and overruled, and that he did not,

*5. —— motion for new trial: presence of the prisoner.*

either by himself or his counsel, waive the right to be thus present; and for these reasons moved in arrest of judgment. The bill of exceptions recites that, " thereupon the court offered to permit the defendant to file or argue his motion for a new trial anew, which offer was declined by the defendant, and, thereupon, the court disregarded the objection and motion in arrest of judgment, to which the defendant excepted."

It is better, but we do not say that it is necessary, for the defendant to be present in person upon the argument of a motion for a new trial. See Rev. §§ 4681, 4706, 4826, 4854, 4863. Indeed our inclination would be to hold that this is not a right which the statute secures to him; that the trial contemplated by section 4706, ends with the rendition of a verdict.

But however this may be, and this is what we hold, the error, if any, was cured by the offer of the court, which

6. — offer to reconsider. the defendant declined to accept. The declination by the defendant of the offer of the court, demonstrates the technical nature of the objection, shows that the action of the court did the defendant no substantial injury, and robs the alleged error of any quality or substance entitling him to make it a ground of reversal in this court. Rev., § 4925.

V. Finally, it is urged that the verdict is against the weight of evidence.

That the defendant killed the deceased is not denied. It was claimed by the defendant, upon the trial, that the killing was excusable homicide, because done in self-defense, or in the defense of his property and home. Upon any view of the evidence, even taking the evidence adduced by the defendant, this theory is wholly inadmissible.

The only doubt which could exist would be, whether the real offense was, as the jury found, murder in the

second degree, or manslaughter. An outline of the material facts may be thus given : The defendant kept a saloon and grocery store in Cedar Rapids. The offense was committed on the night preceding Christmas, A. D. 1864, at ten or eleven o'clock P. M. The deceased was a young man, and he and some of his companions were out for a spree, and were more or less under the influence of liquor. In the earlier portion of the evening, they drank at the defendant's saloon. Others were in there at the same time. The deceased and his party left and visited other saloons, and drank. The deceased, in the course of the evening, heard that the defendant had accused him of stealing tumblers when he was in his saloon ; and he, with three other persons, started for the defendant's premises. It was now quite late at night, near eleven o'clock. The defendant's house (one part of which was a grocery store, another a saloon, with counter, shelves, &c., and another the place where the defendant and his family reside) was still open. The testimony is conflicting as to whether the deceased and his associates broke open the doors and forced their way in ; and it is also conflicting in some other respects. The testimony of Maxwell, who happened to be in the house, and not in any way connected with the disturbance, is perhaps substantially correct. He says that the deceased and his companions, after getting in, went up to the counter in the middle room and called on the defendant for something to drink. Defendant said, "You go away; you cannot get any drink from me. You stole my tumblers." Then Akers (the deceased) called him a liar, and a d — d liar, and said, "I put down a dollar bill and got no change." Akers wanted his change, and defendant said he had got it. Defendant was at end of counter. When Akers called defendant a liar, they had their hands against each other's shoulders. They separated, and defendant went behind the counter. Hunter (one of the associates of the deceased),

took Akers back on the floor. Defendant repeatedly told Akers to go away. Akers denied stealing the tumbler, and said that the other boys did it. Neither Hunter or the others did or said anything, until Hunter remarked: "It is too bad to accuse our boys of stealing." Deceased and defendant called each other liars. Then Akers made at defendant, and the latter pushed him away. Akers tried to get at defendant. They were close enough to put their hands on each other. Hunter took hold of Akers and pushed him back, and said, "You must not have any fuss." Defendant then stepped behind the counter; got his pistol down, when Akers made at him. Defendant then said to Akers, "I will show you if you don't." Defendant reached the pistol over the counter three or four times. Akers then stepped back, pulled off his coat. The next I saw, he was shot, and he fell and died.

Akers had no weapons of any kind, and he and the defendant were about the same size. "After the defendant shot, I heard him say, 'I told you that is the way I do.'" Koke (one of the associates of the deceased) testified, among other things, "I first saw the pistol in the defendant's hand; he reached across the counter by making two or three motions, and leveled his aim two or three times so as to bring it level. Akers was three feet from the counter; the counter was eighteen inches wide, and the defendant was behind the counter when the shot was fired."

Mrs. Decklotts testified that the deceased did steal a tumbler and put it in his pocket; that the door was locked when the party returned; that deceased and his party (except Hunter) broke the lower bolt and forced their way in; that Akers first commenced about the tumbler; that defendant did not accuse him of stealing it, but simply said it was gone; that somebody had it. Akers then struck at the defendant and hit his arm or shoulder, pulled off his

coat and went at him again.   Defendant had told him two
or three times to leave the house.   Akers made a motion
(being then near counter and defendant behind it) as though
he wanted to get something out of his bosom, " as though
he was taking something out of his bosom," and then it
was that the shot was fired.   Both parties were excited and
mad.   Another woman (a German), an inmate of the house,
but who did not understand what was said, testifies as to
this motion of the deceased toward his bosom.   But the
other witnesses say nothing of this.   Mrs. Decklotts also
testified that about three-quarters of an hour before the
shooting she heard Akers who, with one other person, was .
outside, say, "he was going in and going to clean him out
and kill the d—n Dutchman."   This is not corroborated
by any other witness.

Some of the State's witnesses deny that there were any
blows passed prior to the shooting.   It was proved that
the defendant was accustomed to keep the pistol behind a
glass inside of the counter.

It is not a little difficult, frequently, even where the tes-
timony is not conflicting, to determine what shall be con-
sidered murder or manslaughter.   This is particularly
difficult where the evidence, as in the present case, is con-
flicting or the facts complicated.   The boundaries

7.—
manslaugh-
ter.   between murder and manslaughter cannot always
be distinctly ascertained and traced.   The rules of law are
plain, but their application difficult.   When death ensues
from the sudden transport of passion, or heat of blood,
upon *reasonable provocation*, without malice, the offense is
manslaughter, not murder. 1 Russ., 580; 1 Hale, 466;
4 Bl. Com., 191.

What is *reasonable or adequate provocation*, which in such
cases is taken to extenuate the killing from murder to
manslaughter, is a question upon which it is obvious,
different opinions will, in many instances, be entertained.

Considering here the deadly nature of the weapon used, that the deceased was without weapons, that the defendant was in no great, if, indeed, any danger of his life, or serious bodily harm; that he was several feet distant from the deceased, and protected by a counter, from any assault that he might make, we say, if these be considered to be the essential facts, it is a plain case of murder as distinguished from manslaughter.

But if we should regard it as established, that the deceased and his party had threatened violence against the defendant; had forced open his house to provoke a contest; that defendant believed that the deceased, in any contest with him, could rely upon the sympathy and aid of his companions, and that they were sufficient to overpower him and his friends; that the defendant, when he shot, also believed that the deceased was reaching in his bosom for a weapon, and that he thereupon shot instinctively and not deliberately, the pistol lying there and not having been purposely provided, these circumstances, in connection with the insolent behavior of the deceased, would go very far toward, if, indeed, they would not be sufficient, to reduce the offense to manslaughter.

Under instructions which laid down the law correctly, but not as fully or as pointedly as would be desirable, the jury have found the offense to be murder in the second degree, and not manslaughter. Taking the whole evidence together, we think this was a correct conclusion. The danger to the defendant was *really* nothing, and was not even *apparently* imminent and great. His use of a loaded pistol, under these circumstances, aimed at the breast of the deceased, the natural result of which would be to take life or inflict great bodily injury, indicates very strongly that this was his intention, especially if the testimony of his deliberateness of aim be credited, and if so, the offense is murder.

It would have been a very different question if the weapon used had been one not likely to endanger life, or if the deceased had himself been seen to be armed with a dangerous weapon, or if his companions had been counseling and stimulating him to make an assault upon the defendant, instead of endeavoring to dissuade him from it.

The occurrence is truly a most unfortunate one. The conduct of the deceased was highly blameworthy. He it was that provoked the difficulty, instigated, doubtless, by the liquor which he drank, and to the use of which he became a victim. The only mitigation his conduct finds, if it finds it at all, is in the fact that he was intoxicated, and in part by liquor sold to him by the defendant. It would not do to hold that a saloon keeper may sell another that which steals away his senses, overthrows his judgment and clouds his reason, makes him boisterous, quarrelsome, and offensive, and then, himself being in no serious danger, shoot him dead because he is unreasonable, insulting and quarrelsome.

Still, there are many circumstances, some of which have been mentioned and some not, which should induce a somewhat lenient consideration of the defendant's case. Considering these, and the possible doubt, which, in one view of the case, might exist as to the grade of the offense, the court has deemed it proper, though reluctant, to interfere with the *quantum* of punishment imposed by the court below, to reduce the imprisonment from sixteen years to ten, the *maximum* punishment for manslaughter, and probably sufficient, under the circumstances, even assuming the verdict, as to the degree of guilt, to be correct.

With this modification the judgment below is

Affirmed.