The State v. Dooley.

THE STATE v. DOOLEY *et al., Appellants.*

Division Two, May 8, 1894.

1. **Criminal Practice:** INDICTMENT: STATUTE. An indictment under Revised Statutes, 1889, section 3489, for assault with intent to kill with malice aforethought is sufficient, if it follows the language of the statute.

2. ———: ASSAULT TO KILL: VERDICT. A verdict of "assault to kill without malice" instead of "an assault with intent to kill without malice" is sufficient.

3. **Criminal Law:** ASSAULT. Pointing a pistol at another within shooting distance constitutes an assault.

4. ———: ASSAULT WITH DEADLY WEAPON. An assault with a deady weapon once entered upon and partly executed is none the less an assault because it did not proceed to the last extremity threatened, simply because the assaulted party yielded to the enforced demand.

5. ———: DEFENSE OF PROPERTY: QUANTUM OF FORCE. A man may lawfully defend his property in possession by any degree of force, short of the taking of life, necessary to make the defense effectual, but he should not resort to means reasonably calculated to endanger life. *State v. Forsythe*, 89 Mo. 667. •

6. ———: RECAPTURE OF PROPERTY: QUANTUM OF FORCE. Where property is taken away from those in possession and in good faith claiming possession, forcibly and without authority and in their presence, they may recapture it without resorting to legal process.

7. ———: ———: ———. The title to such property being in dispute, the right of recapture is restricted to such force as is reasonably necessary to accomplish the purpose, provided it does not extend to the use of a deadly weapon or to an assault likely to produce death or great bodily harm.

8. **Criminal Practice:** WARRANT: SERVICE IN ANOTHER COUNTY. Officers of one county can not serve a warrant in another county, unless indorsed by a magistrate of the latter county or by the county clerk of the former county, as provided by Revised Statutes, 1889, section 4024.

9. **Criminal Law:** RECAPTURE OF PROPERTY. The right to recapture property unlawfully taken is not limited to the immediate time and place and is not lost, though the property is temporarily taken out of sight, when the pursuit is immediate.

The State v. Dooley.

*Appeal from Lafayette Criminal Court.*—Hon. John E. Ryland, Judge.

Reversed and remanded.

*Pope Higgins* and *Samuel Davis* for appellants.

(1) The fifth instruction for the state is misleading, in that it leaves out of view the question of intent, which is the very essence of this case. (2) The fifth, seventh and ninth instructions for the state tend to confuse the jury as to what constitutes the offense charged, and give the jury to understand that they may convict, regardless of the intent with which the assault was made. (3) The eighth instruction given for the state is not warranted by the evidence. Evans, if constable at all, was constable of a township in Lafayette county, and Bennett was marshal of Higginsville in Lafayette county, while the pretended arrest was made in Saline county. (4) The evidence tends to prove that defendants intended to compel Bennett and Evans to give up the horses by putting them in fear, and, in the absence of qualifying circumstances, might show an assault with intent to rob, but in view of the claim of ownership by defendants, it does not show even that, and defendant's sixth instruction should have been given. (5) The verdict is a nullity. It does not find defendants guilty of assault "with intent" to kill nor of common assault, and yet the court refused the fine as fixed by the jury because it was not large enough, and assessed a higher fine, assuming that the jury intended to find defendants guilty of assault "with intent" to kill. (6) The forcible taking of the horses by Bennett and Evans was a trespass *ab initio*, and the seventh instruction asked by defendants should have been given. 5 Lawson on Criminal Defense, 871; *Finn v. Com*, 6 Pa. St. 460;

1 Bish. Crim. Law, secs. 41, 537; 6 Baxter, 608; *Corn v. Mason*, 116 Mass. 58; *State v. Forsythe*, 89 Mo. 667; *Roberts v. State*, 14 Mo. 138.

*R. F. Walker*, Attorney General, for the state.

(1) The indictment in this case is sufficient, and follows the language of section 3489, Revised Statutes, 1889, under which it is drawn. (2) The verdict is supported by the testimony, and was such as warranted the trial court in submitting defendant's guilt or innocence to the jury; no prejudice, passion or misconduct on the part of the jury is suggested by the record. This being true, the judgment should be affirmed. *State v. Banks*, 118 Mo. 117 and cases cited. (3) Having been convicted of assault with intent to kill without malice, appellants are in no position to complain of any instructions relating to the offense of assault to kill with malice. *State v. Dunn*, 80 Mo. 681. (4) The instructions which relate to and cover the offense of which they were convicted correctly declare the law and are not subject to criticism of the appellants; those asked by the defendants and refused by the court were erroneous and unsupported by the testimony, and were properly refused. (5) It does not appear in what respect the court erred in admitting and excluding testimony. From a careful reading and examination of the record, we find nothing prejudicial to the defendant. (6) The appeal in this case, seems to be without merit. The defendants were convicted of a lesser offense than that authorized by the testimony, and the only error apparent from the record is that the jury attempted to exercise the power of commuting or pardoning by assessing a fine against the defendants, when under the testimony they would

have been warranted in assessing their punishment at imprisonment in the penitentiary.

GANTT, P. J.—On the fifteenth of June, 1892, Mrs. Gus Price was the owner of two horses, which were in the possession of the defendants at Sweet Springs. Mrs. Price resided at Higginsville, in LaFayette county, and had offered a reward for these horses. R. T. Bennett was city marshal of Higginsville, and George C. Evans constable in Davis township, in Lafayette county.

On the fifteenth of June, 1892, Gus Price was engaged in driving for the defendants on their bus line from the city of Sweet Springs to the well known water resort of the same name, close by. He drove the horses that belonged to his wife. On this day, marshal Bennett and constable Evans arrived at Sweet Springs and made known to defendants that they had a warrant for the arrest of Gus Price for stealing these horses, and they arrested Price, and told Dooley they would start with Price and the horses that night. In the meantime Price proposed to sell the horses to W. H. Dooley, and Dooley agreed to give him $150 and stand good for all the expenses. There was no evidence that Dooley paid Price anything for the horses in pursuance of this agreement.

It does appear in a general way that the defendants had hired the horses, and Price to drive the bus, but the terms of this hiring and the time it was to continue, is nowhere stated. After the talk of selling to the defendants, Bennett and Evans proceeded to take the horses from defendants' stables at the Springs, but just as they were on the eve of starting, the eldest Dooley appeared at the stables and forbade their moving the team. Bennett and Evans apparently acquiesced that night and left the horses in defendants' stable.

Next morning the team was hitched to the bus and placed in charge of a driver named Taylor and was driven into the city to the station to meet a train. Defendant Harvey Dooley accompanied the bus.

In the meantime Bennett had hired a carriage from another liveryman and procured two extra halters. While the team was standing at the station awaiting the train, Bennett, Evans and Gus Price suddenly appeared and at once began to unhitch the horses from the bus. Harvey Dooley wanted to know if they had a warrant for the horses, and they said no, that Price had told them to take them; and, when asked, Price said he gave them authority to take them. They placed the extra halters on the two horses and left in the carriage, leading the Price horses. Harvey Dooley at once notified his father and codefendant. Harvey armed himself with a Winchester rifle, and William H. Dooley took a revolver, and, mounting their horses, they pursued Bennett and Evans. They overtook them near the town of Concordia, in Lafayette county. They rode up on either side of Bennett's carriage, ordered the driver to stop, which he did, and they pointed their weapons at Bennett and Evans, ordered them to throw up their hands and turn the horses loose, or they would shoot their heads off. Bennett and Evans made no resistance but at once released the horses, and, at defendants' command, the driver drove them on to Higginsville, and the defendants returned with the horses to Sweet Springs. Bennett and Evans had no writ for the horses.

In a few days the defendants released the horses to Price's son, or stepson, on condition that Price would first pay his attorney his fee. It appeared incidentally in the evidence that Evans was prosecuted and fined $1 for malfeasance in Saline county, for his conduct in the affair.

The defendants were indicted for an assault with intent to kill Bennett, with malice aforethought, and were convicted of an assault to kill, without malice, and a fine of $75 each assessed against them by the jury, which the court increased to the minimum fine of $100 each, and from these fines they appeal.

I. The indictment was sufficient and follows the statute under which it was drawn. R. S. 1889, sec. 3489. A point is made on the insufficiency of the verdict because "the jury found the defendants *guilty of assault to kill* without malice," instead of an assault *"with intent to kill."*

This point was ruled adversely to defendants' contention in *State v. Clarkson*, 96 Mo. 364. The form of the verdict was well enough.

II. Nothing prejudicial in the admission or rejection of evidence is assigned as error, nor do we discover anything material.

III. All the assignments of error relate to the giving and refusal of instructions, and these will be examined. The court instructed on assault with intent to kill, with malice aforethought, and for assault with intent to kill, and for simple assault. As the jury found there was no malice, it is unnecessary to discuss the sufficiency of the instructions as to assault with intent to kill with malice aforethought.

In the fifth instruction for the state the court instructed the jury that "if defendants in a threatening manner, pointed a loaded pistol and rifle, or either, at Richard T. Bennett, within shooting distance of said Bennett, such act of defendants constitutes, in law, an assault." This was a correct definition of an assault as applied to the facts of this case. The intent with which that was done was left to another instruction. It was entirely proper, however, to advise the jury what constituted an assault.

In the seventh instruction the jury were told that "if the defendants assaulted Richard T. Bennett with deadly weapons and demanded that the horses in controversy be surrendered or turned over to defendants, and by reason of such assault said horses were turned over to defendants and the use of such weapons prevented or avoided, then the fact that the said weapons were not used because of a compliance with such demand, constitutes no excuse or defense to defendants."

In other words, the court simply told the jury that an assault with a deadly weapon, once entered upon, and partly executed was no less an assault because it did not proceed to the last extremity threatened, simply because the assaulted party yielded to the enforced demand. It needs no reason or authority to sustain this instruction.

The ninth instruction for the state told the jury that, "even though they should believe that Richard T. Bennett and George C. Evans irregularly or improperly obtained possession of the horses in controversy, yet such fact would not justify defendants in retaking the same by force, nor by the use of a deadly weapon." Whereas defendants, in their sixth instruction, which was refused by the court, prayed the court to instruct the jury "that, if the defendants had possession of said horses, and George C. Evans, Richard Bennett and Gus Price took said team from defendants, without defendants' authority, and drove away with said horses, and that immediately thereafter the defendants followed said parties and demanded and took said horses away from said Bennett, Evans and Price and used no more force than was necessary to do so, then defendants are guilty of no crime."

The propriety of the giving of the said instruction

for the state, and refusal of said instruction for defendants will determine the merits of this appeal.

That the evidence sustains the claim that the defendants were in the actual possession of the horses, claiming a property or possessory right in or to them, must be, we think, conceded. Their conduct must be measured, so far as this charge is concerned, by the facts as they existed that morning, or reasonably appeared to exist. Now Bennett and Evans had no writ or authority to take the horses. Conceding they had a warrant for Price, that did not authorize them to seize the horses in the possession of a third person.

Admitting that they were without lawful authority to take the horses, but that they did so, two questions arise: *first*, could defendants lawfully recapture them without resorting to the process of the courts, and, *second*, how much force could they lawfully use in effecting a recapture.

The first question must be answered in the affirmative. If the jury found, as we think there was evidence from which they could so find, the defendants were in possession of these horses, in good faith claiming said possession, and Bennett and Evans, without authority, forcibly, in their presence, took them from their driver, the defendants had the right to retake them from Bennett and Evans. *State v. Elliot*, 11 N. H. 540; *Commonwealth v. Donahue*, 148 Mass. 529; *Anderson v. State*, 6 Baxter (Tenn.), 608; *Com. v. Lynn*, 123 Mass. 218; 1 Bishop's New Crim. Law, sec. 536, par. 3.

And this brings us to the second and important inquiry in this case, *how much force might defendants exert* in reclaiming the horses. The power to retake is incident to the right to defend, but it is sometimes said that the right to recapture property, is more limited than its defense, *when in actual possession*, and while it is allowed, the courts have been cautious in defining

the right, and justly so, on account of the danger usually attending the recapture, both to the owner, and the peace of the community.

When one's property is taken with a felonious intent, the urgency of the recapture is vastly greater than when there is a simple conflict in the claim of title to the property. In the case of felony, great force may be resorted to with propriety; but where there is clearly no felony, but a mere dispute as to the legal ownership, a resort to violence, disproportionate to the value of the property, and where peaceful remedies would prove equally efficacious, should not be sustained. It is asserted by Bishop that "while a man may use all reasonable and necessary force to defend his real or personal estate, of which he is in the actual possession, against another who comes to dispossess him without right, he can not innocently carry this defense to the extent of *killing the aggressor*." 1 Bishop's New Crim. Law, sec. 857; Bishop's Crim. Law [6 Ed.], sec. 861. And the same learned authority also says: "Yet, consistent with this proposition is another, that one, *in the defense of his property* (as distinguished from the defense of his person), should not resort to means reasonably calculated to endanger life." Bishop's Crim. Law [6 Ed.], sec. 861. And this statement of the law was unanimously approved by this court in *State v. Forsythe*, 89 Mo. 667.

In *State v. Morgan*, 3 Ired. (N. C.) 186, a constable had seized the defendant's gun, which was his "arms for muster," and was privileged by law from seizure. The defendant drew his axe on the constable and said: "Give up the gun or I'll split you down." After some further parley, the matter was arranged and the gun released. On an indictment for an assault with intent to kill, the question was, whether the conditional threat coupled with the act of holding the axe

in a position to strike, constituted an assault with intent to kill. Judge Gaston said: "Assuming, then, that the constable had wrongfully taken the gun, and that the defendant had a right to require its return, and that exertion of force, nothing short of that which was begun on the part of the defendant, would have availed to compel its return, in our opinion the assault is not justified. *It was made with a deadly weapon*, which, if used, would have probably occasioned death, and *made without any previous resistance on the part of the officer*. It was, therefore, an assault with intent to kill. If this intent were lawful, the assault with that intent was lawful. If this intent were unlawful, an assault with that intent can not stand justified. /Now, when it is said that a man may rightfully use as much force as is necessary for the protection of his person or property, it should be recollected that this rule is subject to this most important modification, that he shall not, except in extreme cases, endanger human life or great bodily harm.' * * * The purpose is indeed rightful, but it is not one of such paramount necessity as to justify a resort to such desperate means." *Com. v. Donahue*, 148 Mass. 529; see, also, *State v. McDonald*, 4 Jones, (N. C.) 19; *McDaniel v. State*, 8 S. & M. (Miss.) 418; *Com. v. Drew*, 4 Mass. 391; *Oliver v. State*, 17 Ala. 587; *Harrison v. State*, 24 Ala. 67; *State v. Vance*, 17 Iowa, 138.

The case at bar is strikingly similar to the case of *State v. Morgan, supra*. In this case, as in that, the act of the defendants in presenting two deadly weapons at Bennett and Evans was apparently a most dangerous assault accompanied with a present purpose to do great bodily harm or kill them, and the only declaration by which the character of the assault is mitigated or attempted to be changed, is that their purpose was not unconditional, but having commenced the assault and

proceeded far enough to put Evans and Bennett in extreme danger, they suspended long enough to permit them to comply unconditionally with their demands, to loose the horses.

"To hold," says Judge GASTON, in the *Morgan case*, "that such an act, under such circumstances, was not an offer of violence—not an attempt to commit violence, would be, we think, to outrage principle and manifest an utter want of that solicitude for the preservation of peace, which characterizes our law, and which should animate its administrators. To every purpose—both in fact and in law—the attack on the prosecutor was begun—and in the pause which intervened before its consummation, most happily for both parties, an arrangement was made which prevented the probably fatal result. But this pause—though intentional, and announced when the attack began—does not prevent that attack from being an offer or attempt to strike. If a ruffian were to level his rifle at a traveler, and announce to him that he might have fifteen minutes to make his peace with his God—and the unfortunate man should save his life by prayers, by remonstrance, by money, or any other means before the expiration of that time, could it be pretended that there had been no attempt nor offer to hurt him, because the intent was not to kill instantaneously, and therefore did not accompany the act?    *    *    * Wherever the act is done *in part execution of* a purpose of violence—whether that purpose be absolute or provisional—makes no difference as respects the question, whether the act be an assault. In both cases the assailant equally violates the public peace. In both he breaks down the barrier which the law has erected for the security of the citizen. In the former, he sets up none in its place. In the latter, he substitutes for it the protection of his grace and favor."

Several witnesses in this case testified that the defendant William H. Dooley had his pistol drawn and his son Harvey, to use his own expression, "covered Bennett with his rifle" before they demanded the horses.

In his testimony, defendant W. H. Dooley, when asked if they had not given him the horses if it was not his purpose to use his pistol, answered, "*I was after those horses.* * * * If I had to use them, I would have scuffled with them a while first. *If they had attempted to shoot, we would have drawed there and might have got them.*" In other words, not only his conduct, but his own testimony, indicated that he had a settled and determined purpose to shoot Bennett and Evans unless they complied with his demands. The pistol and rifle were both in position to shoot before the demand was made. If the defendants did effect the recapture of the horses by presenting the loaded revolver and rifle at Bennett and his party, then they exceeded the force authorized by law and the unlawful taking of the horses by Bennett is no justification for such an assault.

The defendants' instruction number 6 unqualified, as it was, would have been misleading, because the jury might have found that nothing less than an assault with the rifle and pistol would have secured a release of the horses and hence would have been bound to say such an assault for that purpose was justifiable. Had the court, in the ninth instruction for the state, only said that defendants would not be justified in retaking said horses by the use of a deadly weapon, that instruction would have been correct, but it went further and said they would not be justified in retaking "by force."

Now we have seen that defendants were authorized to regain their lawful possession by force, provided that force did not consist of "means reasonably calculated

to endanger life, or great bodily harm," and hence the instruction in this respect denied defendants a right vouchsafed them by the law. The defendants' sixth instruction should have been modified so as to restrict their right to recapture to such force as was reasonably necessary to effect that purpose, *provided* it did not extend to the use of a deadly weapon or to an assault likely to produce death or great bodily harm. Subject to this qualification it is a question of fact for the jury in each case, how much force is reasonable and necessary.

The eighth instruction for the state was erroneous in that it predicated Evans' right to seize the horses upon the warrant to arrest Price, and Bennett's right to assist, upon Evans' request. The warrant was not in evidence, but it would seem plain that neither Bennett nor Evans, although officers of Lafayette county, had any right to serve a warrant in Saline county, unless it was indorsed by a magistrate of Saline county or by the county clerk of Lafayette county, as provided by section 4024, Revised Statutes, 1889, and the warrant against Price, though properly indorsed, would not have justified them in taking the horses from the possession of defendants, if the latter were in the actual possession thereof, under a claim of right. Of course, if the jury should find as a fact that the possession of defendants was a mere sham to aid Price in retaining the possession from his wife and that defendants had no property rights in the horses by contract of purchase or hire, then they had no right to take them from Bennett and Evans, if the latter obtained possession by the consent of Price.

This eighth, instruction was also erroneous in that it denies, as does the second instruction for the defendant, the right to *pursue and take* the property. If, as we understand these two instructions, they limit the

right of defendants to retake *to the immediate time, and place, of taking,* and deny it if the horses were temporarily taken out of their sight in the flight to Higginsville although the pursuit was immediate, we think they restrict the right of recaption too narrowly. With these modifications, the instructions will fairly present the case to the jury on a new trial.

The judgment is reversed and the cause remanded for a new trial. All of this division concur.

