# United States Court of Appeals

## For the Eighth Circuit

_____

No. 11-3352

_____

Mark Atkinson

*Plaintiff - Appellant*

v.

City of Mountain View, Missouri; Derek Sanders; Michael Bales

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: September 20, 2012
Filed: February 8, 2013

_____

Before RILEY, Chief Judge, SMITH and COLLOTON, Circuit Judges.

_____

RILEY, Chief Judge.

Mark Atkinson, a retired military police officer, sued the City of Mountain View, Missouri (city), and its former police chief, Derek Sanders, under 42 U.S.C. § 1983. Atkinson claimed Sanders, dressed in street clothes, used excessive force in violation of the Fourth and Fourteenth Amendments when, without identifying himself as a police officer, Sanders charged at Atkinson. The charge slammed

Atkinson ten to fifteen feet backward into the side of a pickup truck, causing Atkinson severe injuries.

The district court entered summary judgment against Atkinson on his federal claims and declined to exercise supplemental jurisdiction over his state law claims. Atkinson appeals. Atkinson's claim against Sanders presents a genuine dispute of material fact for trial, but Atkinson's claim against the city does not. We affirm in part, reverse in part, and vacate the district court's dismissal of Atkinson's pendent state law claims.

## I.    BACKGROUND[1]
### A.    The Events of August 31, 2007

Atkinson is a United States Army veteran who served as an M-60 tank driver for four years and a military police officer for nineteen years. After his honorable discharge in 2005, Atkinson earned a master's degree from the University of Arkansas in 2007. On August 31, 2007, Atkinson traveled from his home in Arkansas to Mountain View, Missouri, to attend his nephew Justin Taylor's first varsity football game. Justin, his arm in a sling because of a dislocated shoulder, remained on the sidelines. After the game, as Atkinson and his extended family were preparing to leave, Atkinson saw someone attack and tackle Justin. Justin's father Joe Taylor, Atkinson's brother-in-law, rushed toward Justin. By the time Taylor reached his son, the attacker had pinned Justin to the ground. Taylor bent over the two adolescents and began "hollering." "Get off my boy," he yelled. Taylor wanted to stop the fight without "grab[bing] somebody."

---

[1]Because this appeal arises from a grant of summary judgment, we recite the facts in the light most favorable to Atkinson, the non-moving party. See, e.g., Young v. Allstate Ins. Co., 685 F.3d 782, 783 (8th Cir. 2012).

As Atkinson moved toward his nephew, he saw an unknown man approach Taylor, who now was bending down with his hands on his knees. The stranger pushed Taylor and began to yell. Leaning into Taylor's face, the stranger said, "I'm the motherf[---]er who says who does what around here." As Atkinson approached them, Taylor was "start[ing] towards" the unknown man. Worried Taylor was going to "retaliate," Atkinson pushed Taylor and the stranger apart and said, "Look, calm down." The stranger accused Atkinson of assault, pulled out a cell phone, reached toward Atkinson, and said, "I'll take care of you." Believing the stranger to be a "compadre" of the adolescent who had attacked Justin, and fearing the man wanted to call for "reinforcements," Atkinson took the cell phone without touching the man and asked, "Why can't you just talk to us?"

Atkinson "was just about to hand [the phone] back" when the stranger "bull rushed" Atkinson—this unknown man charged "like a football [player]," ramming his shoulder into the right side of Atkinson's chest. The charge slammed Atkinson ten to fifteen feet backward into the side of a parked pickup truck. When Atkinson looked up, Mountain View police officers handcuffed him. As a result of the blow, Atkinson spent twenty-four days in the hospital for treatment of three broken ribs, a punctured lung, and repeated pneumothorax—his right lung collapsed three separate times.

Unbeknownst to Atkinson until after he was handcuffed and in the backseat of a police cruiser, the unknown man who caused these injuries was Derek Sanders, Mountain View's police chief. Sanders, though on duty, was not in uniform and had neither his gun nor his badge. Sanders never identified himself as a police officer. Atkinson testified, "[I]f [Sanders] would have said . . . he was a police officer, I would have . . . respected him." All criminal charges against Atkinson stemming from the incident were later dismissed.

## B.     The City

Mountain View is classified as a "Fourth Class City" under Missouri law. See Mo. Rev. Stat. § 72.040. Sanders testified the city's mayor and city council were the final authority on the police department's policies, and the mayor testified the city council set those policies. Sanders also testified he was "the policy maker" for his department, but he "could not use [the policy] until it was reviewed and signed off by the mayor and city council." During Sanders' tenure as police chief from 2005 to 2009, the city had no binding, written policies on any police-related issue, including use of force. Sanders had formulated non-binding guidelines for the department, and he testified his own actions on August 31, 2007, were consistent with those guidelines. Neither the city council nor the mayor ever approved the guidelines, which Sanders explained were "a work in progress." The guidelines were not official city policies and did not apply to Sanders' subordinates.

## C.     The District Court's Decision

Atkinson sued the city and Sanders under 42 U.S.C. § 1983, alleging Sanders used excessive force in violation of the Fourth and Fourteenth Amendments and the city was liable for Sanders' unconstitutional conduct. Atkinson also asked the district court to exercise pendent jurisdiction over his state law claims against Sanders. The district court granted summary judgment against Atkinson on his federal claims and declined to exercise pendent jurisdiction over his state law claims.

The district court analyzed Atkinson's excessive force claim under two different constitutional standards. First, analyzing Sanders' actions under the Fourteenth Amendment's Due Process Clause, see, e.g., Cnty. of Sacramento v. Lewis, 523 U.S. 833 (1998), the district court found "no material factual dispute regarding whether defendant Sanders violated plaintiff's substantive due process rights by acting maliciously and sadistically with the intent to cause harm." Purportedly viewing the evidence in the light most favorable to Atkinson, the district court found it undisputed that Sanders "only used force to take his cell phone back

-4-

from plaintiff after he was deprived of his means of communication" and that Sanders "clearly" did not "act[] sadistically or maliciously to simply cause harm, but rather . . . acted in good faith to restore balance to the situation."

Second, analyzing Sanders' actions under the Fourth Amendment's objective reasonableness standard, see, e.g., Graham v. Connor, 490 U.S. 386, 396-97 (1989), the district court found no genuine issue of material fact related to "the reasonableness of [Sanders'] actions from the perspective of the objectively reasonable officer." Having concluded Sanders violated neither the Fourth nor Fourteenth Amendment, the district court did not decide whether a seizure occurred or whether Sanders was entitled to qualified immunity.

Turning to Atkinson's municipal liability claim, the district court held that the city could not be held liable under Monell v. Department of Social Services of New York, 436 U.S. 658, 690 (1978), because no evidence established Sanders' actions were the product of a city policy, and, in any event, Sanders had not violated Atkinson's constitutional rights. Rejecting Atkinson's argument that the city was liable under Monell by virtue of its delegation of policymaking authority to Sanders, the district court relied on a Missouri statute, which grants policymaking authority in a "Fourth Class City" to the mayor and city council. Atkinson appeals, arguing (1) Sanders seized him under the Fourth Amendment, (2) Sanders' use of force was objectively unreasonable, and (3) the city is liable for Sanders' actions.

## II.    DISCUSSION

We review grants of summary judgment de novo. Davenport v. Univ. of Ark. Bd. of Trs., 553 F.3d 1110, 1112-13 (8th Cir. 2009). The non-moving party receives the benefit of all reasonable inferences supported by the evidence, but has "the obligation to come forward with specific facts showing that there is a genuine issue for trial." Dahl v. Rice Cnty., Minn., 621 F.3d 740, 743 (8th Cir. 2010). Summary judgment is only appropriate when there is "no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); see also Dahl, 621 F.3d at 743.

Because Atkinson's claims arise under § 1983, we will reverse the district court's award of summary judgment to Sanders only if a reasonable jury could find Sanders, "'acting under the color of state law,'" violated "'a right secured by the Constitution and laws of the United States.'" Cook v. City of Bella Villa, 582 F.3d 840, 848-49 (8th Cir. 2009) (quoting West v. Atkins, 487 U.S. 42, 48 (1988)); see 42 U.S.C. § 1983. We will reverse the district court's award of summary judgment to the city only if a reasonable jury could find that "action pursuant to official municipal policy of some nature caused a constitutional tort." Monell, 436 U.S. at 691.

## A.    Section 1983 Claim Against Sanders

Atkinson's § 1983 claim against Sanders rests primarily on an alleged violation of Atkinson's Fourth Amendment right to be free from excessive force while seized. To find in Atkinson's favor on this claim, a jury would need to conclude Sanders used objectively unreasonable force against Atkinson. See Graham, 490 U.S. at 395-97; see also Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). There is no genuine dispute of material fact for a jury to resolve unless, in the light most favorable to Atkinson, (1) Sanders seized Atkinson under the Fourth Amendment, (2) this seizure violated Atkinson's Fourth Amendment rights, and (3) Sanders is not entitled to qualified immunity. See, e.g., Moore v. Indehar, 514 F.3d 756, 759 (8th Cir. 2008).

### 1.    Seizure

Atkinson contends that when Sanders barreled into him, Sanders effected a Fourth Amendment seizure. Sanders argues that a police officer's use of physical force against an unwilling subject does not always implicate the Fourth Amendment right "against unreasonable . . . seizures," U.S. Const. amend. IV. The district court agreed with Sanders. We agree with Atkinson.

In accordance with the Supreme Court's decision in California v. Hodari D., 499 U.S. 621 (1991), our understanding of a Fourth Amendment seizure of the person flows from the common law. See id. at 623-25, 626 n.2; cf. United States v. Jones, 565 U.S. ___, ___, 132 S. Ct. 945, 950 (2012) ("At bottom, we must 'assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.'" (quoting Kyllo v. United States, 533 U.S. 27, 34 (2001))). Although "seizure" and "arrest" were not identical at common law, we look to the common law concept of arrest to "define[] the limits of a seizure of the person." Hodari D., 499 U.S. at 627 n.3 (emphasis omitted). At common law, "[i]t [wa]s perfectly clear that . . . touching the person constitute[d] an arrest." Sandon v. Jervis, (1859) 120 Eng. Rep. 760 (Exch. Cham.) 762; El. Bl. & El. 942, 947 (Williams, J.); see also Genner v. Sparks, (1704) 87 Eng. Rep. 928 (Q.B.) 929; 6 Mod. 173 (per curiam) ("[I]t was agreed, that if here he had but touched the defendant even with the end of his finger, it had been *an arrest*.").

Physical contact was not the sole means of arrest under the common law. See, e.g., Arrowsmith v. Le Mesurier, (1806) 127 Eng. Rep. 605 (Ct. Com. Pl.) 606; 2 Bos. & Pul. (N.R.) 211, 211 ("I can suppose that an arrest may take place without an actual touch."). Common law arrest required "'*either* touching *or* submission.'" Hodari D., 499 U.S. at 627 (quoting Rollin M. Perkins, The Law of Arrest, 25 Iowa L. Rev. 201, 206 (1940)) (emphasis added). Because the Supreme Court has directed us to apply this common law dichotomy to seizure of the person under the Fourth Amendment, we similarly "require[] *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." Id. at 626.

To constitute a Fourth Amendment seizure, an application of physical force "must be willful" because "the word 'seizure' . . . can hardly be applied to an unknowing act." Brower v. Cnty. of Inyo, 489 U.S. 593, 596 (1989). Whether physical force was "intentionally applied," id. at 597 (emphasis omitted), is determined by the officer's objective behavior, not his subjective motive. Cf.

Brendlin v. California, 551 U.S. 249, 260 (2007). Also implicit in the term "seizure" is a requirement that the application of physical force "restrain[] . . . freedom of movement." Id. at 254. This restraint need not actually "'succeed in stopping or holding [the person] even for an instant.'" Hodari D., 499 U.S. at 625 (quoting Asher Cornelius, Search and Seizure 163-64 (2d ed. 1930)). But the seizure does not outlast the restraint on free movement. See id. at 624-25.

None of Sanders' arguments calls into question our longstanding approach to seizure of the person under the Fourth Amendment. See Ludwig, 54 F.3d at 471 ("[A] seizure is 'effected by the slightest application of physical force' despite later escape." (quoting Hodari D., 499 U.S. at 625)); see also Cole v. Bone, 993 F.2d 1328, 1332 (8th Cir. 1993) ("In []Hodari D., the Supreme Court held that a seizure occurs only when the pursued citizen is physically touched by the police *or* when he submits to a show of authority by the police." (emphasis added)). Sanders builds his ill-fated arguments on an interpretation of the Supreme Court's decision in United States v. Mendenhall, 446 U.S. 544 (1980), a case decided well before the Court's decision in Hodari D. and before our decisions in Cole and Ludwig. Pointing to Mendenhall, Sanders would have us ignore the physical force that hurled Atkinson backward and ask only whether, at the moment Atkinson landed on the ground, he "would [reasonably] have believed that he was not free to leave," id. at 554. This is the wrong question.

Although "Mendenhall establishes that the test for existence of a 'show of authority' is an objective one," the case does not stand for the proposition that a person can be seized *only* through a "show of authority." Hodari D., 499 U.S. at 628. Instead, the Mendenhall test applies "precisely" to a "seizure effected through a 'show of authority.'" Id. Our reading of Mendenhall is consistent with cases decided after Mendenhall, see, e.g., Brendlin, 551 U.S. at 254, and with earlier cases such as Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968) ("Only when the officer, by means of physical force *or* show of authority, has in some way restrained the liberty of a citizen

-8-

may we conclude that a 'seizure' has occurred." (emphasis added)). It would make little sense to ask whether a person felt "free to leave" while an officer restrained the person's freedom of movement through physical force because the force itself necessarily—if only briefly—"restrained [the person's] liberty." Terry, 392 U.S. at 19 n.16.

Viewing this case through the common law lens of Hodari D., we conclude the facts most favorable to Atkinson are sufficient to establish a seizure occurred the moment Sanders charged into Atkinson. It is undisputed Sanders intentionally applied physical force against Atkinson, and the evidence most favorable to Atkinson shows far more than a slight physical touch—Sanders' "bull rush" forced Atkinson ten to fifteen feet backward into the side of a truck, broke three ribs, punctured one lung, and caused repeated pneumothorax. This violence was more than enough physical force to effect a seizure under the Fourth Amendment.[2] See, e.g., Acevedo, 457 F.3d at 725 ("In a case like this one . . . where a police officer's use of force causes a man to reel backwards and fall to the ground, a seizure has occurred."); see also United States v. Pratt, 355 F.3d 1119, 1122 (8th Cir. 2004).

---

[2]Our conclusion is consistent with the views of our sister circuits. See, e.g., Slusher v. Carson, 540 F.3d 449, 454 (6th Cir. 2008) (holding a Fourth Amendment seizure occurred when a police officer grabbed a woman's hand); United States v. Brown, 448 F.3d 239, 245 (3d Cir. 2006) ("[A] seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'" (quoting Hodari D., 499 U.S. at 626)); Acevedo v. Canterbury, 457 F.3d 721, 724-25 (7th Cir. 2006) ("It is true that language in some of our previous decisions might, out of context, lend itself to th[e] interpretation [that physical force alone cannot constitute a seizure] . . . . [b]ut the Supreme Court has held otherwise." (citing Hodari D., 499 U.S. at 626)); Vaughan v. Cox, 343 F.3d 1323, 1329 n.5 (11th Cir. 2003) (same). Sanders' use of force not only restrained Atkinson's freedom of movement, but actually stopped his movement.

Because there is enough evidence of a Fourth Amendment seizure, we need not decide whether a reasonable jury could find Sanders' conduct "shocked the conscience" in violation of the Fourteenth Amendment. See, e.g., Cnty. of Sacramento, 523 U.S. at 848-50, 855; Myers v. Scott Cnty., 868 F.2d 1017 (8th Cir. 1989).

### 2. Fourth Amendment Violation

Having found sufficient evidence of a Fourth Amendment seizure, we next consider whether that seizure was "objectively reasonable within the meaning of the Fourth Amendment." Ludwig, 54 F.3d at 470 (citing Krueger v. Fuhr, 991 F.2d 435, 438 (8th Cir. 1993)). "We evaluate the reasonableness of an officer's use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Brown v. City of Golden Valley, 574 F.3d 491, 496 (8th Cir. 2009) (quoting Graham, 490 U.S. at 396). Our "reasonableness" analysis "requires careful attention to the facts and circumstances of each particular case." Graham, 490 U.S. at 396. The district court concluded Sanders' actions, including the "bull rush," were objectively reasonable as a matter of law. We disagree.

Viewing the facts most favorably to Atkinson and giving him the benefit of all reasonable inferences, we think the three factors specifically identified by the Supreme Court in Graham weigh against Sanders. First, Atkinson had not committed any "severe or violent crime." City of Golden Valley, 574 F.3d at 496; see also Graham, 490 U.S. at 396; Cook, 582 F.3d at 849. A reasonable officer in Sanders' position would not think otherwise if, as Atkinson and Taylor testified, Atkinson did no more than attempt to avoid a fight between Sanders and Taylor. Second, Atkinson did not "pose[] an immediate threat to the safety of the officer[] or others." Graham, 490 U.S. at 396; see also Cook, 582 F.3d at 849. Sanders could not reasonably think otherwise under Atkinson's view of the facts. Although a jury could accept Sanders' claim that Atkinson threatened him by pushing him away from Taylor, "a jury could just as well interpret that conduct," City of Golden Valley, 574 F.3d at 497, as a non-

-10-

threatening effort by Atkinson to separate Taylor and Sanders and prevent them from fighting. A reasonable jury also could interpret Atkinson's question—"Why can't you just talk to us?"—as evidence that Atkinson sought to defuse Sanders' anger through peaceful words, not violence.[3] Third, Atkinson was neither "actively resisting arrest [n]or attempting to evade arrest by flight." Graham, 490 U.S. at 396; see also Cook, 582 F.3d at 849. Sanders could not reasonably have thought otherwise because Sanders did not identify himself as a police officer and because, as Sanders admits, he did not attempt to arrest Atkinson peacefully before physically charging at Atkinson.

Of particular relevance to the third Graham factor, we must at this stage assume Sanders did not identify himself as a police officer before he "bull rushed" Atkinson. A reasonable officer in Sanders' position—without either of the first two Graham factors justifying a forceful arrest—would not have thought it appropriate to charge Atkinson without *first* identifying himself as a law enforcement official and giving Atkinson a chance to return the cell phone peacefully. By remaining anonymous, Sanders never gave Atkinson the opportunity to comply with a legitimate request by a law enforcement official. Objectively, when Sanders told Atkinson to return the cell phone, Sanders' request was not the demand of a peace officer, but the plea of an "irate" civilian. As Sanders himself admits, we "must accept as true that [Atkinson] was unaware of a police presence until well after Sanders used force." Thus, a reasonable officer in Sanders' position could not reasonably think Atkinson was resisting arrest. Given these "facts and circumstances," Graham, 490 U.S. at 396, we cannot conclude Sanders' use of force was objectively reasonable as a matter of law.

---

[3]The dissent, disagreeing with this interpretation of the facts, concludes Atkinson "committed an assault and stole property." Post at 25. Were that true, we would still decline to interpret the Fourth Amendment in such a legalistic way that would authorize police officers to "bull rush" a teacher, a parent, or any adult who separates two quarreling children or adolescents tussling over an object and who then confiscates the object until the two calm down.

-11-

In reaching this conclusion, we also do not ignore the severe injury Atkinson suffered. See, e.g., Montoya v. City of Flandreau, 669 F.3d 867, 872 (8th Cir. 2012). Although a *de minimis* injury does not "necessarily foreclose[] a claim of excessive force under the Fourth Amendment," a claim must be based upon more than a "*de minimis* use of *force*." Chambers v. Pennycook, 641 F.3d 898, 906 (8th Cir. 2011). Although we now focus on *force* rather than *injury*, Chambers does not stand for the premise that the severity of an injury is no longer relevant evidence. See Montoya, 669 F.3d at 872; Chambers, 641 F.3d at 906. On the contrary, "the lack, or minor degree, of any *injury* sustained . . . is relevant in considering the reasonableness of the *force* used." Cook, 582 F.3d at 850 (emphasis added). Atkinson's three broken ribs, punctured lung, and repeated pneumothorax far exceed the comparatively minor injuries sustained by the plaintiffs in Cook. See id. Atkinson's injuries are more severe than the "cuts and abrasions across [the plaintiff's] body" and the "knee [injury] causing . . . difficulty in walking" sustained by the plaintiff in Copeland v. Locke, 613 F.3d 875, 881 (8th Cir. 2010)—injuries which we considered to be, "as a matter of law," more than "*de minimis*." Id. Because "[t]he degree of injury is . . . relevant insofar as it tends to show the amount and type of force used," Chambers, 641 F.3d at 906, a reasonable jury could find Sanders used more than *de minimis* force against Atkinson.

For these reasons, we do not agree with the district court that Atkinson's Fourth Amendment claim against Sanders presents no genuine dispute of material fact. A reasonable jury could find Sanders was an overzealous police officer who, without identifying himself as a law enforcement official, used excessive force and unreasonably caused Atkinson severe injuries in violation of the Fourth Amendment. If the jury credited Sanders' evidence, the jury could find Sanders was a responsible professional who reasonably thought it necessary to use force against Atkinson to defuse a potentially dangerous dispute. Which story is more plausible we cannot say because "it is not our function to remove the credibility assessment from the jury." Kukla v. Hulm, 310 F.3d 1046, 1050 (8th Cir. 2002).

-12-

### 3. Qualified Immunity

Having found no objectively unreasonable conduct, the district court did not decide whether Sanders was entitled to qualified immunity. Because we "'may uphold a grant of summary judgment for any reason supported by the record, even if different from the reasons given by the district court,'" Chambers, 641 F.3d at 904 (quoting Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999)), we next consider whether Sanders is entitled to qualified immunity. He is not.

Our test for qualified immunity has two parts: (1) whether there is sufficient evidence the officer "violated a constitutional right," and (2) whether the "constitutional right [the officer violated] was so 'clearly established' at the time of the alleged violation that a reasonable officer would have known that his conduct was unlawful." Rohrbough v. Hall, 586 F.3d 582, 585 (8th Cir. 2009) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). Having already concluded the district court erred in finding Sanders' use of force objectively reasonable as a matter of law, we proceed to part two.

Whether a right is "'clearly established' is a question of law for the court to decide." Rohrbough, 586 F.3d at 586. Our analysis is objective: "[f]or a right to be deemed clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Buckley v. Rogerson, 133 F.3d 1125, 1128 (8th Cir. 1998) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Because "[t]he dispositive inquiry is whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted,'" Rohrbough, 586 F.3d at 586 (quoting Saucier, 533 U.S. at 202), we conduct a "fact-intensive inquiry . . . in light of the specific context of the case," Samuelson v. City of New Ulm, 455 F.3d 871, 875 (8th Cir. 2006). At the summary judgment stage, granting qualified immunity "is not appropriate where . . .

-13-

a dispute remains regarding facts material to the qualified immunity issue." Rohrbough, 586 F.3d at 587.

Viewing the record in the light most favorable to Atkinson, we decide the unlawfulness of Sanders' charging Atkinson "would be clear to a reasonable officer" in Sanders' situation. Saucier, 533 U.S. at 202. As a general matter, "[t]he right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person." Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998). Although we have not previously confronted a situation identical to this case, "[t]here is no requirement that 'the very action in question [be] previously . . . held unlawful.'" Vaughn v. Ruoff, 253 F.3d 1124, 1129 (8th Cir. 2001) (quoting Anderson, 483 U.S. at 640). It is enough that "earlier cases . . . g[a]ve" Sanders "'fair warning that [his] alleged treatment of'" Atkinson "'was unconstitutional.'" Meloy v. Bachmeier, 302 F.3d 845, 848 (8th Cir. 2002) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)). On August 31, 2007, Sanders had "fair warning" that charging at a non-resisting individual without first identifying himself as a police officer was unconstitutional in the context of an arrest.[4] See, e.g., Samuelson, 455 F.3d at 877 (denying qualified immunity where there was evidence officers "stepped on [the arrestee's] head while handcuffing him [and] . . . . beat[], hit, and kicked [him] *although he was not resisting arrest*" (emphasis added)).

We doubt a reasonable officer in Sanders' position would have needed to "consult[] a casebook," Catlin v. City of Wheaton, 574 F.3d 361, 369 (7th Cir. 2009), to recognize the unreasonableness of using enough force to cause three broken ribs,

---

[4]Although Sanders contends he merely intended to retake his cell phone, not to arrest Atkinson, a reasonable jury could find that Sanders "objectively manifested," Brendlin, 551 U.S. at 260, an intent to arrest Atkinson. The reported fury of Sanders' charge temporarily incapacitated Atkinson, and immediately thereafter Sanders ordered Mountain View police officers to take Atkinson into custody.

a punctured lung, and repeated pneumothorax against a man who was objectively using peaceful means to prevent a fight.[5]  Even if the conduct which cast Sanders in the role of "irate" stranger was itself reasonable, a reasonable officer finding himself in that role would have sought to pacify—not escalate—the  tense situation.  A reasonable officer would recognize that his own conduct—shoving a father who was trying to extract his son from a fight and announcing "I'm the motherf[---]er who says who does what around here"—directly contributed to the tense situation.

But had Sanders perused the United States Reports on August 31, 2007, he would have discovered the Supreme Court's 1989 decision in Graham, showing his extreme use of force against Atkinson was unconstitutional.  In Graham, the Supreme Court expressly tied the reasonableness of force under the Fourth Amendment to three factors: (1) "the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.  In 1992, our court applied the Graham factors and denied police qualified immunity in an excessive-force case where, as in Atkinson's case, (1) the arrestee's "alleged misconduct was neither violent nor serious," (2) "[t]here [wa]s little evidence to indicate that [the arrestee] posed a physical threat to anyone," and (3) "there [wa]s a factual dispute as to whether [the arrestee] was 'actively' resisting arrest." Gainor v. Rogers, 973 F.2d 1379, 1388 (8th Cir. 1992).  In more recent excessive-force decisions, we focused on evidence the arrestee was not resisting arrest. See, e.g., Samuelson, 455 F.3d at 876 (denying qualified immunity in 2006 because "[t]he facts, viewed in the light most favorable to [the arrestee], demonstrate[d] he was compliant with the officers' requests and did not resist arrest"); Kukla, 310 F.3d at 1050

---

[5]The dissent takes issue with our interpretation of the facts "in the light most favorable to the non-moving party." Davis v. Hall, 375 F.3d 703, 711 (8th Cir. 2004). If three reasonable judges disagree about the facts contained in the record, surely the factual dispute is genuine enough to require resolution by a reasonable jury. See, e.g., Kukla, 310 F.3d at 1050.

(denying qualified immunity to a police officer who "forced [a non-resisting arrestee] against [a] truck," causing injuries less severe than broken ribs and a punctured lung); Lambert v. City of Dumas, 187 F.3d 931, 934 (8th Cir. 1999) (denying qualified immunity where police officers "'violently shoved' and 'kicked' [the arrestee] into the patrol car" even though the arrestee "did not resist arrest").

The "linchpin" of our decision is not that Sanders should have known the Fourth Amendment required him "to identify himself as an officer before using force to carry out an arrest in public." Post at 22-23. We deny Sanders qualified immunity because as in Gainor, Lambert, Kukla, and Samuelson, there is a genuine dispute of material fact whether *any* of the three Graham factors reasonably justified slamming Atkinson into the side of a truck with enough force to break three ribs and puncture a lung. Our emphasis on Sanders' failure to identify himself flows directly from Graham's third factor: it is convincing *evidence* that Atkinson was neither "actively resisting arrest [n]or attempting to evade arrest by flight."[6] Graham, 490 U.S. at 396. Had Sanders clearly identified himself and Atkinson still intervened or refused to return the cell phone, Sanders might reasonably expect Atkinson would "actively

_____

[6]For this reason, the Seventh Circuit's decision in Catlin, relied upon by the dissent, post at 23, is inapposite. In sharp contrast to Sanders, the police officers in Catlin reasonably believed *all three* Graham factors justified using force to effect an arrest without identifying themselves as law enforcement professionals. First, the Catlin officers believed the man they were arresting had an outstanding "arrest warrant . . . for Class X felonies—the highest class of felony under [their state's] law." Catlin, 574 F.3d at 363; cf. Graham, 490 U.S. at 396. Second, the Catlin officers reasonably expected the targeted arrestee to be "armed and dangerous." Catlin, 574 F.3d at 363; cf. Graham, 490 U.S. at 396. Third, the Catlin officers knew the targeted arrestee "had resisted arrest on several prior occasions and that he had threatened violent resistance if the police attempted to re-arrest him." Catlin, 574 F.3d at 363; cf. Graham, 490 U.S. at 396. In that context, the Seventh Circuit unsurprisingly concluded the officers "were under no constitutional obligation to carry out the arrest in a way that would have given [the arrestee] an opportunity to make good on his earlier threats." Catlin, 574 F.3d at 366.

resist[] arrest," id. But if Atkinson's account is accepted, then Sanders could not reasonably expect active resistance to an unidentified officer. It is not for us, at the summary judgment stage, to construe the evidence in Sanders' favor.

To the extent Sanders asserts Missouri police officers are entitled to use more force to recover a cell phone than to effect an arrest, he is mistaken. It would defy reason if the same amount of force were unconstitutional if used to arrest one compliant individual, but constitutional if used to retrieve a piece of property from another equally compliant individual. A police officer, certainly, may retake his own property using force *incident* to his power to arrest, preserve the peace, or protect the public. However, Missouri law cannot give police officers a freestanding right to use excessive force to recover personal property.[7] See U.S. Const. art. VI, cl. 2; U.S. Const. amend. IV.

For these reasons, we hold Sanders is not presently entitled to qualified immunity.

**B.     Section 1983 Claim Against the City**

Atkinson rests his claim for municipal liability on three alternate grounds: (1) the city delegated final policymaking authority to Sanders, (2) Sanders

---

[7]Missouri law does not appear to distinguish between police officers and private individuals in permitting only reasonable and necessary "self-help" to recover personal property. See Mo. Rev. Stat. § 563.041; State v. Dooley, 26 S.W. 558, 562 (Mo. 1894) ("[R]ight to recapture [is restricted] to such force as was reasonably necessary to effect that purpose, provided it did not extend to the use of a deadly weapon or to an assault likely to produce death or great bodily harm."); State v. Shilling, 212 S.W.2d 96, 99 (Mo. App. 1948) ("If more force is used than necessary [to protect personal property], it constitutes criminal assault.") (citing State v. Kaiser, 78 Mo. App. 575 (1899)); Mo. Approved Jury Instr. (MAI) § 32.10 (7th ed. 2012) (explaining the requirement that a defendant "use[] only such force as was reasonable and necessary"); Restatement (Second) of Torts § 106 (1965).

-17-

"established unwritten policies, customs and usages for the City [that] condone the use of excessive force," and (3) the city failed adequately to supervise or train Sanders. Although the Supreme Court has "held that a municipality is a 'person' that can be liable under § 1983," it is well established "that a municipality cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." Szabla v. City of Brooklyn Park, Minn., 486 F.3d 385, 389 (8th Cir. 2007) (citing Monell, 436 U.S. at 690-91). Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an "official municipal policy," Monell, 436 U.S. at 691; (2) an unofficial "custom," id. at 690-91; or (3) a deliberately indifferent failure to train or supervise, see City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). We consider in turn each justification Atkinson advances for holding the city liable under § 1983.

### 1. Final Policymaking Authority

Atkinson admits that no written municipal policy was a "moving force," Monell, 436 U.S. at 694, behind Sanders' conduct, but Atkinson asserts his injuries nonetheless resulted from the city's "official municipal policy," id. at 691, because Sanders was one of the city's final policymakers. We disagree.

Whether Sanders exercised final policymaking authority for the city is "a question of state law." St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) (plurality opinion);[8] Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986) (plurality opinion). We recognize that some language in one of our previous cases may have suggested a role for juries in identifying municipal policymakers. See Copeland, 613 F.3d at 882 ("The district court rejected [the] claims for municipal liability because *no reasonable juror* could find that (1) [the police chief] was the 'final policy-maker'

_____

[8]One year later in Jett, Justice Kennedy (who took no part in Praprotnik) joined the Praprotnik plurality in holding that the identity of a municipality's final policymaker is a legal question. Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989); id. at 738 (Scalia, J., concurring).

-18-

[or] (2) the city delegated final authority to [the police chief]. . . . *We agree*." (emphasis added)). To the extent this language implied the identity of a municipality's final policymaker was a question of fact for the jury, it was inconsistent with our earlier cases, see, e.g., Ware v. Jackson Cnty., Mo., 150 F.3d 873, 885 (8th Cir. 1998); Angarita v. St. Louis Cnty., 981 F.2d 1537, 1547 (8th Cir. 1992), and the Supreme Court's decision in Jett, 491 U.S. at 737, id. at 738 (Scalia, J., concurring).[9]

It is "the trial judge"—not the jury—who "must identify those officials . . . who speak with final policymaking authority for the local government." Jett, 491 U.S. at 737; id. at 738 (Scalia, J., concurring). Only after the judge identifies an official as a final policymaker is it appropriate "for the jury to determine whether [that official's] 'decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur.'" Angarita, 981 F.2d at 1547 (quoting Jett, 491 U.S. at 737). The interpretation of Jett we adopted in Angarita is consistent with the interpretations adopted by every other circuit[10] and the Supreme Court in its later decisions, see, e.g., McMillian v. Monroe Cnty., Ala., 520 U.S. 781, 784-85 (1997).

In accordance with Jett and Angarita, we consult two key sources to determine whether the district court correctly held that Sanders was not a final policymaker: (1) "state and local positive law" and (2) state and local "'custom or usage' having the force of law." Jett, 491 U.S. at 737 (quoting Praprotnik, 485 U.S. at 124 n.1).

---

[9]Despite the imprecise language in Copeland, 613 F.3d at 882, we went on in that case to decide the final policymaker question in accordance with state law. See id. ("[A]s a matter of Missouri law, [the police chief] is not the final policy maker.").

[10]See, e.g., Walden v. City of Providence, R.I., 596 F.3d 38, 55 (1st Cir. 2010) ("Whether an official is a final policymaker is . . . a question of law for the trial judge to decide."); Milligan-Hitt v. Bd. of Trs. of Sheridan Cnty. Sch. Dist. No. 2, 523 F.3d 1219, 1224 (10th Cir. 2008) ("The judge, not the jury, should determine who exercises final policymaking authority in a municipality.").

First, as a matter of Missouri positive law, Sanders was not a "final policymaker" for the city. See Copeland, 613 F.3d at 882 ("Under Missouri state law, the mayor and the board of aldermen of a [Fourth Class City] are the final policymakers for the 'good government of the city [and] the preservation of peace and good order.'" (second alteration in original) (quoting Mo. Rev. Stat. § 79.110)).

Second, Atkinson's argument that the city had a custom of delegating final policymaking power to Sanders is unsupported by any evidence in the record. On the contrary, the record evidence indicates the city's mayor and board of aldermen retained final policymaking power over Sanders, the police department, and the department's official policies. Because the identity of the city's final law enforcement policymaker is a legal question, Atkinson's argument that "the evidence is sufficient to support a *jury* finding that . . . Sanders was the policymaker for the City" entirely misses the mark. Having "review[ed] the relevant legal materials," Jett, 491 U.S. at 737, we agree with the district court that Atkinson cannot establish Sanders was—as a matter of Missouri law—a final policymaker for the city.

### 2. Alternative Grounds for Municipal Liability

Atkinson next contends the city may be liable even if Sanders is not a final policymaker because the city (1) sanctioned unofficial customs that permitted police officers to use excessive force, (2) failed to enact written policies on the use of force, and (3) failed adequately to train and supervise Sanders. Even in the most favorable light for Atkinson, the evidence contradicts these contentions.

Although Sanders testified his actions on August 31, 2007, were consistent with his department's "policies, procedures, and guidelines," Atkinson can point to no city policy or custom—written or unwritten—that was a "moving force [behind] the constitutional violation," Monell, 436 U.S. at 694. Because there is no evidence

-20-

of a facially unlawful city policy or custom,[11] Atkinson could prove his case to a reasonable jury only if he could demonstrate some municipal action or inaction, taken "with 'deliberate indifference' as to its known or obvious consequences," Bd. of Cnty. Com'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 407 (1997) (quoting Harris, 489 U.S. at 388), caused his injuries. See Szabla, 486 F.3d at 390-91. Nothing in the record would enable Atkinson to meet "the rigorous, deliberate indifference standard of fault." Id. at 395.

Atkinson's bare allegation that "the absence of a binding, written policy on the use of force demonstrated deliberate indifference on the part of the City" is patently insufficient. As we made clear in Szabla, a municipality may not be held liable under § 1983 merely because it "failed to implement a policy that would have prevented an unconstitutional act by an employee otherwise left to his own discretion." Id. Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability. See Brown, 520 U.S. at 409; Szabla, 486 F.3d at 392-93. Other than the single incident at issue in this case, Atkinson has submitted no evidence of excessive force by Sanders or any other city police officer. Because no reasonable jury could find the city had notice that its lack of written use-of-force policies was likely to result in a constitutional violation, the city's failure to adopt such policies does not create a genuine dispute of material fact.

Atkinson has also failed to make a submissible case for municipal liability based on the city's training and supervision of Sanders. Under § 1983, "a claim for failure to supervise requires the same analysis as a claim for failure to train." Robinette v. Jones, 476 F.3d 585, 591 (8th Cir. 2007) (citing Liebe v. Norton, 157 F.3d 574, 579 (8th Cir. 1998). Neither claim can succeed without evidence the

---

[11]Atkinson does not argue the city ratified any unlawful conduct, and there is no evidence the city ratified Sanders' use of force. Cf. Dixon v. Lowery, 302 F.3d 857, 867 (8th Cir. 2002).

municipality "[r]eceived notice of a pattern of unconstitutional acts committed by [its employees]." Parrish v. Ball, 594 F.3d 993, 1002 (8th Cir. 2010). Atkinson has presented no evidence indicating the city had reason to believe, before the events giving rise to this case, that its training or supervision of Sanders was inadequate. Absent some form of notice, the city cannot be deliberately indifferent to the risk that its training or supervision of Sanders would result in "a violation of a particular constitutional or statutory right." Brown, 520 U.S. at 411. Because no reasonable jury could find the city liable under § 1983, the district court correctly granted the city's motion for summary judgment.

## III.  CONCLUSION

We affirm the district court's summary judgment in favor of the city, reverse the district court's summary judgment in favor of Sanders on Atkinson's excessive force claim, vacate the district court's dismissal of Atkinson's pendent state law claims, and remand the case to the district court for further proceedings consistent with this opinion.

COLLOTON, Circuit Judge, concurring in part and dissenting in part.

The linchpin of the court's decision to deny qualified immunity to defendant Derek Sanders is that Sanders was required to identify himself as a police officer to plaintiff Mark Atkinson before Sanders used more than *de minimis* force to seize and arrest Atkinson. From the dramatic portrayal of Sanders as a "stranger" and "unknown man," *ante*, at 3, to the legal conclusion that a reasonable officer would not have "thought it appropriate to charge Atkinson without *first* identifying himself as a law enforcement official and giving Atkinson a chance to return the cell phone peacefully," *id.* at 11, the court rests its decision on the proposition that the Fourth Amendment required Sanders to identify himself. "By remaining anonymous," the court reasons, "Sanders never gave Atkinson the opportunity to comply with a legitimate request by a law enforcement official." *Id.* Central to the court's holding

is that Sanders's call for Atkinson to return the cell phone he had taken from Sanders "was not the demand of a peace officer, but the plea of an 'irate' civilian." *Id.* In denying qualified immunity, the court says that "[o]n August 31, 2007, Sanders had 'fair warning' that charging at a non-resisting individual *without first identifying himself as a police officer* was unconstitutional in the context of an arrest." *Id.* at 14 (emphasis added).

There is a significant problem with the court's analysis: It was not clearly established in 2007 that the Fourth Amendment required a police officer to identify himself as an officer before using force to carry out an arrest in public, even when self-identification might have obviated the need to use force. Two years after the incident in this case, the Court of Appeals for the Seventh Circuit surveyed the law and determined that "*it is far from clearly established* that the Fourth Amendment requires police officers to identify themselves in the course of carrying out an arrest in a public place." *Catlin v. City of Wheaton*, 574 F.3d 361, 369 (7th Cir. 2009) (emphasis added). The Seventh Circuit was "aware of no court of appeals decision that has recognized a constitutional obligation on the part of the police to announce their identity when they carry out an arrest in a public place." *Id.* The court found that "the district courts that have considered this issue are, if anything, divided." *Id.*; *see Sanchez v. City of New York*, No. 96-C-7254, 2000 WL 987288, at *5 (S.D.N.Y. July 17, 2000) (observing that the plaintiff's Fourth Amendment claim "assumes the uncertain proposition that the reasonableness of a seizure outside the home depends on whether the police officer made an announcement or identification at all"). "Even if the defendants had consulted a casebook," the Seventh Circuit explained, "they still would not have had fair notice that they had a constitutional obligation to announce their identity prior to completing the arrest." 574 F.3d at 369.

The majority, *ante*, at 16 n.6, declares *Catlin* inapposite based on an inapposite portion of the opinion. Of course, the Seventh Circuit concluded that the Fourth Amendment did not require police officers to identify themselves when such notice

would have allowed a suspect to flee or fight. 574 F.3d at 366. But the court addressed separately whether the officers unreasonably failed to identify themselves when there was no risk of causing flight or resistance, and when they used force against an arrestee who was resisting only because he believed that "he was being attacked by common criminals." *Id*. at 368. Even though a jury could have found that self-identification would have caused the arrestee to have "given up without a fight, thus obviating the need for the [officers'] final show of force," *id*., the court held that the officers were entitled to qualified immunity against a claim that they used excessive force. *Id*. at 369. Just as in this case, the court was confronted with an argument that the failure of police officers to identify themselves was relevant to whether the arrestee was resisting arrest or attempting to evade arrest, *see Graham v. Connor*, 490 U.S. 386, 396 (1989), but the Seventh Circuit nonetheless held that the use of force by unidentified officers to quell resistance did not violate a clearly established right.

The court cites no authority to undermine the Seventh Circuit's conclusion. The only case cited in support of the court's assertion that Sanders had a constitutional duty to identify himself has nothing to do with a police officer's obligation to declare his official status. *See Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir. 2006). When there is a legitimate question about whether a public official's conduct violates the Fourth Amendment, the official is entitled to qualified immunity. *Anderson v. Creighton*, 483 U.S. 635, 640-41 (1987). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Austell v. Sprenger*, 690 F.3d 929, 936 (8th Cir. 2012) (internal quotation omitted). The central premise of the court's analysis—that Sanders violated clearly established rights under the Fourth Amendment by using force against Atkinson without first identifying himself as a police officer—is mistaken. Sanders is entitled to qualified immunity.

-24-

Aside from the question whether Sanders unreasonably failed to identify himself as an officer, the undisputed facts support the district court's conclusion that Sanders acted reasonably. Atkinson did not appeal the district court's ruling that Sanders had probable cause to arrest Atkinson. *See* R. Doc. 113, at 12 ("It cannot be seriously argued that a police officer, under the circumstances, did not have probable cause to believe that plaintiff had committed a crime and that there were legal grounds to arrest him."). That there was probable cause for an arrest is thus not an "interpretation of the facts," *ante*, at 11 n.3; it is the law of the case. *Little Earth of the United Tribes, Inc. v. U.S. Dep't of Hous. and Urban Dev.*, 807 F.2d 1433, 1437-38 (8th Cir. 1986).

There was probable cause to believe that Atkinson committed an assault and stole property when Atkinson, by his own admission, put his hands on Sanders, pushed him back a little, and snatched Sanders's cell phone as Sanders tried to make a call for help. Sanders asked Atkinson to return the phone, but Atkinson refused to give it back. Atkinson admits that when Sanders called for the return of his phone, Atkinson kept the phone and said, "Why don't you talk to us? Why can't you just talk to us?" When Sanders again said, "Give me my phone back," Atkinson admits that he merely looked down at the phone and said, "You mean this?" A reasonable officer could have interpreted Atkinson's feigned uncertainty about Sanders's request as a determined refusal to return the property. It was reasonable for Sanders to arrest Atkinson, and more than *de minimis* force reasonably was required for an unarmed officer to make the seizure. The court emphasizes the injuries suffered by Atkinson when Sanders "bull rushed" him into a truck, but by Atkinson's own admission, Sanders "was trying to knock me down to the ground" with "a football move." It was after Atkinson, in his words, "kept on side-stepping" that Sanders slid Atkinson into the truck.[12]

---

[12]The court seems to proceed on a misunderstanding of the undisputed facts when it treats Atkinson as an "adult who separates two quarreling children or

Sanders was alone, unarmed, and deprived of means to communicate with his fellow officers in a situation that was rapidly evolving. Even if Atkinson subjectively intended to do "no more than attempt to avoid a fight between Sanders and Taylor," *ante*, at 10, and even if a jury could believe that Atkinson's refusal to return Sanders's phone was a genuine effort "to defuse Sanders' anger through peaceful words," *id.* at 11, those are not the relevant issues. The relevant question under the Fourth Amendment is not what a jury might conclude about Atkinson's intent with 20/20 hindsight after a full-blown trial, but what a reasonable officer on the scene could perceive at the moment when action was required. *Graham*, 490 U.S. at 396. A reasonable officer had probable cause to arrest Atkinson for assault, and reasonable grounds to believe that barehanded force was necessary to secure Atkinson, to retrieve the officer's property, and to protect the safety of the officer. As the district court cogently explained:

> Sanders was responding to a situation that seemed to be escalating rapidly when he used force against [Atkinson]. He used this force *only* after [Atkinson] had interjected himself into the fray by getting between defendant and Joe Taylor and then physically seizing [Sanders's] cell phone from him. The incident occurred after a high school football game where emotions typically run high, and the officer was [] out-numbered. His effort to call for assistance was thwarted by [Atkinson], who demonstrated no intention of returning the phone. The reasonableness of the particular force used must be judged from the perspective of a reasonable officer on the scene. Under the circumstances, the Court finds, after careful review, that the amount of force used by defendant Sanders was objectively reasonable and did not amount to a violation of the Fourth Amendment.

---

adolescents tussling over an object and who then confiscates the object until the two calm down." *Ante*, at 11 n.3. There is no evidence that the cell phone that Atkinson snatched from Sanders had been the object of a tussle.

The doctrine of qualified immunity requires an exercise of judicial restraint that sometimes can be discomfiting. Even when a court believes that a defendant violated the constitutional rights of a plaintiff, the court is required to dismiss the plaintiff's claim if the unconstitutionality of the defendant's conduct was not clearly established. Perhaps this is an appropriate case in which to announce a rule that a police officer must identify himself before using more than *de minimis* force to complete an arrest, if it is reasonable to believe that self-identification would obviate the need to use force. *See, e.g.*, *Johnson v. Grob*, 928 F. Supp. 889, 905 (W.D. Mo. 1996). The Seventh Circuit thought that was a "close question" in 2009. *Catlin*, 574 F.3d at 368. But the rule announced by the court today was not clearly established in 2007, and the putative unlawfulness of Sanders's action was not apparent under pre-existing law. *See Anderson*, 483 U.S. at 640. I would affirm the judgment.

———————————————